Hayes v. Marvin Plumley Appreciate it. Our second case today is Hayes v. Plumley. Hayes v. Plumley Mr. Swindle. Yes, sir. Good to have you. Are you a third-year law student? Yes, sir. At the University of Georgia? That's correct. You've got a nice audience and they'll probably all like to be in your shoes one of these days. Yes, sir. May it please the Court. My name is Ryan Swindle. I represent Mr. Larry Hayes. The District Court has certified two issues for appeal. First, whether Mr. Hayes' false confession was involuntary. And second, whether Mr. Hayes is entitled to an evidentiary hearing to determine whether Dr. Mock was qualified to perform autopsies under West Virginia law. Turning to the first issue, Mr. Hayes' false confession was involuntary. Mr. Hayes was interrogated three times over a four-day period. During that final interrogation, he denied responsibility over 46 times. Ultimately, he gave what both parties agreed was a false confession. Now, before he did any of that, he signed a Miranda waiver of his constitutional rights. Yes, Your Honor. Correct? Yes, Your Honor. He acknowledged that he understood all of his constitutional rights and he was waiving them. He wanted to talk to the police officer. Yes, Your Honor. And they talked to him for two and a half hours. Yes, sir. And then his statement was used against him. That is correct. But also, the suspect in Lopez, the Tenth Circuit case, he also was Miranda-ized twice. And there he was given a similar choice to what Mr. Hayes was given. There, the agents told him, if you cooperate, you know, you could be looking at six years. And if you don't cooperate and give us answers, you could be looking at six years. Here, Mr. Hayes was given the choice of appearing before a judge during sentencing or being viewed by the prosecutor as a remorseless, cold-blooded killer. Or he could confess. Now, the only import of that choice is, if Mr. Hayes confesses, he will receive more lenient treatment. He will receive less jail time than if he doesn't. On top of that, the detectives from the very good go. Well, they never told him that he had to confess. They just didn't believe that he had no involvement with the accident that killed the child or the event that killed the child. So I don't see that they ever told him, well, you need to confess to some sort of criminal action. They got into this discussion about accidents. But I have a preliminary question for you. Before the state habeas court, the argument was on this issue that there was an ineffective assistance of counsel claim. But then before the district court, it altered itself into a due process claim, which I think you make now. So why does that amount to exhaustion of your state court remedies? Yes, Your Honor. In this case, it's similar to Ram Dass, where it was also ineffective assistance of counsel claim during the state habeas. But then before the district court, it was a due process. And the standard is whether Mr. Hayes fairly presented his claim to the state courts. And that contemplates both the operative facts and controlling legal principles. And Mr. Hayes did that. He gave a substantial portion of the transcript, and he cited the Fifth Amendment, the Fourteenth Amendment, and gave, I think, five or six cases giving the standard for involuntary confession. So encapsulated in that ineffective assistance. I thought the district court disagreed with that analysis but went on and made the analysis on the merits. Yes, Your Honor. The district court did agree, disagree. But the magistrate court agreed that the claim was exhaustive. And it was exhaustive because it encapsulated in the ineffective assistance of counsel claim is the prejudice prompt. And to determine whether Mr. Hayes was prejudiced or not, the state court needed to determine whether his confession was voluntary or not. Because if it was voluntary, then he could not have been prejudiced. So he did fairly present it to the state habeas court, and the state habeas courts reached the merits of the voluntariness claim. If you think the state court adjudicated the voluntariness claim on the merits, that means that we're reviewing it under AEDPA, right? The only question is whether it was unreasonable? Yes, Your Honor. That's correct. Okay. So it doesn't really matter whether the confession was voluntary. Strictly speaking, what matters is whether the state court, you think that there was a state court adjudication on the merits finding it voluntary. And the only question for us is whether that was unreasonable, an unreasonable application of well-settled law. Yes, Your Honor. And involved in that is whether it was voluntary or not. And that state court adjudication that you have to look to was made by the trial court during the trial. Yes, Your Honor. There's no state court adjudication after that, is there, that you'd use? Well, the state habeas court, sir. The state habeas court. The state habeas court? Yes, Your Honor. Which was also the trial court. Same judge. Yes, Your Honor. Supreme Court of Appeals of West Virginia never reviewed this thing. The Supreme Court did review an appeal of the state habeas, and they summarily agreed with the state habeas circuit court. And the direct appeal, they rejected. Yes, Your Honor. That's correct. They declined to hear the case. Yes, Your Honor. Isn't that right? Yes, Your Honor. But Mr. Hayes. So which adjudication by the state court were you saying was unreasonable? The state habeas court. The state habeas court. Yes, Your Honor. Which judges a case in Canoa County who's the same fellow that was the trial court. Yes, Your Honor. So he made two rulings then. He ruled on the trial, and then he came back at a habeas claim, and he ruled again. Yes, Your Honor. And that is the decision that this court must look to. All right. But Mr. Hayes was given a potent threat, and that is if he does not confess to what happened, he was called a liar, he was told that his story of events was not true. If he did not tell the correct story of events, then he would be viewed during charging as a remorseless, cold-blooded killer. On top of that, the detectives from the very beginning gave him this understanding that this was a mistake. They say good people make mistakes. And on JA-31549. Don't the police always do that when they're interrogating people? I mean, that just seems like an extremely common police tactic during interrogations. You're not suggesting that any time the police say something like, come on, good people make mistakes, no one's going to hold it against you if it's a mistake, that all of those confessions are involuntary? No, Your Honor, I'm not. But when you say that this was a mistake, and then you unequivocally and persistently tell them that this did not happen intentionally, while holding up pictures of you holding the little girl saying, look at how you look at her, look how you love her, you cannot convince me that you did this intentionally, and you say that 12 times, and then you suggest how the accident may have occurred, and this is after you just say, I got back from the autopsies, and I've seen the injuries, and then I'm going to suggest to you a scenario of how these injuries could have come about, and then you tell the suspect that if this was an accident, you would not do jail time. Do they ever say that if this was an accident, you will not do jail time? This is one of the two exchanges, Detective Cook, even if it was an accident. If it's an accident, we would deal with it. Accidents happen all the time. If it's an accident, he wouldn't be guilty of anything. If it's not a crime, it's an accident. I think it's reasonable to assume that there are scenarios where accidents can lead to criminal consequences. I suspect it was instructions of the jury on accident. If it was a complete accident, he wouldn't be guilty of anything. Yes, Your Honor, on that specific charge, but there are other charges that could have been brought about if there were scenarios where there was an accident. Well, the police told him that even if you say it was an accident, you're probably going to be charged with making a false statement to us, so he knew there was some other possible criminal consequence, but you go through this scenario, and it sort of looks like the defendant in this case was very deliberately figuring out what kind of story he was going to tell at the end of the interrogation, which indeed was an accident, but even his own expert said that that could not have happened. So tell us as succinctly as you can, what was the unreasonable decision by the state court? The unreasonable decision was that his confession was voluntary, and it wasn't reasonable because he's giving this potent choice of if you do not confess, you will be treated as a remorseless, cold-blooded killer, and that implies that you will be treated more severely. Even though he didn't confess to a crime. Yes, Your Honor, but then there's also this other line of techniques where they tell him unequivocally that this was an accident, you did not do this intentionally, and then they suggest how this accident may have occurred, and then they tell him that people who have accidents don't do jail time, and that's simply not true. There are a wide range of scenarios where accidents do lead to jail time, but when you suggest how this accident may have occurred, it's not surprising that he gave a story of what they told him. They told him, you could have held her in your arms with your body, your body could have hit an object, or you could have an object right here, J8358, J8361. But the thing is, there's a difference between a cold-blooded killer and somebody who had an accident, somebody who was maybe holding a kid by the feet and they slipped. There's a difference. And then he ultimately confessed, I went upstairs and got ready for work. When I came back down, I had a hold of her, and I tripped and landed on her. J8370.  and that's not unreasonable to consider. And this court, under de Gravenry v. McKellar, the United States Supreme Court case, 494 U.S. 1071, 1990, the involuntariness inquiry turns as much as whether the techniques for extracting the statements as applied to this suspect are compatible with the system that presumes innocence and ensures that a conviction will not be secured by inquisitorial means. And if you have an innocent person up there, and the detectives tell them that there's 100% sure that you are guilty, and all but the evidence point to you, and you're the only suspect, and then you tell them that if you do not confess, you will be charged as a remorseless cold-blooded killer, and then also that we are sure you had an accident, you suggest how that accident may have occurred, and then tell the suspect, if you had an accident, you will not do jail time, it is unsurprising that that suspect is going to tell that an accident occurred. So you're saying your bottom line is they tricked him. They tricked him into making that statement. My bottom line is that there are certain promises that can't be refused, and these are one of those promises. If there are no more questions, we'll turn to the second issue. Mr. Hayes is entitled to an evidentiary hearing for two reasons. First, whether the skull fracture was healing was a key issue at trial. Now, there are only two... Now, what is your second issue? Whether Mr. Hayes is entitled to an evidentiary hearing to determine whether State's expert witness, Chief Medical Examiner Dr. Mock, was qualified under West Virginia law to perform autopsies. Is that the way it's framed by Judge Johnston and the certificate of availability? Yes, Your Honor. So your votes are right exactly on what Judge Johnston... Yes, Your Honor, and the issue is whether Mr. Hayes was prejudiced by his trial counsel's failure to take advantage of Dr. Mock's lack of qualifications. I thought he was cross-examined at the trial for at least an hour on his qualifications. Yes, Your Honor, but he never touched on whether Dr. Mock was qualified under West Virginia law. Now, the State of West Virginia increased their qualification... He came back and tried to recall him because he had found some additional impeaching material, he thought. Yes, Your Honor. I mean, this is what we're talking about.  Yes, Your Honor. Mr. Hayes' trial counsel came to realize that Dr. Mock may have lied about whether he did not take the anatomical portion of the American Board of Pathology boards. Now, that is a separate issue of whether Dr. Mock was qualified under West Virginia law. That's not part of the certificate of availability. Yes, Your Honor, it's not part of it because West Virginia gave two paths for qualifications. They increased their statute in 2000... I don't mean to keep interrupting you, but I'm looking at the statute, and the statute 61-12-10A seems to go to qualifications for employment, and it sets up those two paths to employment, but I don't see anywhere in there that it says that if you don't fit those two paths, that you're not qualified to give an opinion. Yes, Your Honor. Now, certainly we go to the weight of the evidence, but do you have something you can direct us to that addresses the qualification of an expert to give an opinion as opposed to employment? No, Your Honor. The state of West Virginia uses the Daubert standard. Now, if Mr. Page's trial counsel was aware that Dr. Mock was not qualified to be hired under West Virginia law, he could have argued that he was not qualified as an expert. So you're saying he wasn't qualified to testify or he wasn't qualified to perform the autopsy? Both, Your Honor. He wasn't qualified, but he did perform the autopsy? He did perform the autopsy. It is a fact that he did the autopsy? Yes, Your Honor. And what he saw when he performed the autopsy, he testified to? Yes, Your Honor, and he testified... To a great extent, he was factless. He was testifying to what he did in detail as he performed the autopsy. But he drew... And he said he found a 4 or 5-inch fracture in the back of the little girl's head. But the key issue... That's a fact. Yes, Your Honor. There wasn't any opinion involved in that, was there? But he concluded that that skull fracture was not healing. Maybe part of it was opinion, but he did perform the autopsy. Yes, Your Honor. And he testified to the facts relating to what he did in performing the autopsy. Correct? Yes, Your Honor, but... So that part of his testimony was going to come in at any event. That is correct, but if he... Hundreds, but... Hundreds of them. He performed hundreds of them. And he was that kind of a doctor. You know, he got a... He had an argument while he was in the trial that he didn't pass one test. Maybe that would have gone some way to the evidence, but that wouldn't have changed the nature of that fracture in the back of the little girl's head or any case. Yes, Your Honor. That was... The jury had that explained to them. They saw that. Yes, ma'am. It's a fact. Yes, you're correct, Your Honor, but may I briefly respond to that? Go ahead. If you can deride a question like that, you can answer it. But you go ahead. Mr. Hayes was prejudiced by his trial counsel's failure to bring attention to the jury that Dr. Mock should have never been hired. If a reasonable juror would have heard from opening statements that the state's key witness, their star witness, never should have been hired by the state, never should have performed that autopsy, a reasonable juror is going to view that testimony with much more skepticism. And when you hear that he didn't even perform a key test... That really goes to the weight of the evidence to be given to his testimony as opposed to his authority, his qualification to give testimony in the first instance. Yes, Your Honor. And the state of West Virginia made the conscious decision to increase the qualifications. It goes to the weight of the authority, which is the nature of the prejudiced inquiry, whether the state could have met its burden of prudent Mr. Hayes guilty beyond a reasonable doubt. And a reasonable juror, when there's a battle of the experts, and as the district court recognized, a key issue at trial was the credibility of Dr. Mock. When they hear that he was not even qualified, that he failed to perform a key test, and that he had only been there for two months, and this was his first job out of a fellowship that was not even certified by the National Certified Files... What impact does the fact that in the record you have the mother's testimony, which would seem to support the factual findings as to how the event happened that were made by Dr. Mock, and then you have, I think it's the pediatric neurologist who treated the child, whose testimony corroborates a large part of Dr. Mock's testimony. So it's not just he's the only witness here. You have at least two corroborating witnesses. Yes, Your Honor. And I will respond to that on rebuttal. I don't want to take too much of your time. Thank you very much, Mr. Rangel. Mr. Viglianco. Reasonable effort. Not as bad as I've heard many times before. Good to have you here, sir. It's a pleasure. Good morning, Your Honors. May it please the Court. My name is Zachary Viglianco, Assistant Attorney General, on behalf of the State of West Virginia and the Respondent Warden. When police officers inform an individual suspected of a crime, of the constitutional rights that are enshrined in Miranda v. Arizona, namely the privilege against self-incrimination, the right to remain silent, and the right to an attorney, it creates a presumption that an ensuing statement, an ensuing inculpatory statement, including a confession, is voluntarily made. As the United States Supreme Court recognized in Missouri v. Cyber, giving the Miranda warnings and getting a waiver produces what they call a virtual ticket of admissibility. And as the Supreme Court explained in Berkmeyer v. McCarty, cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled, despite the fact that the law enforcement authorities adhere to the dictates of Miranda, are rare. The record in this case demonstrates that at the very beginning of the October 4th interrogation, in which Mr. Hayes engaged in, he was given a document. That document was reviewed with him by the police officers. He understood his Miranda rights. He signed each of those rights initialed next to them. And therefore, he executed a valid waiver of his right to remain silent. Under the presumption that the United States Supreme Court has recognized in Cyber, his statements flowing therefrom were voluntary. And therefore, the statement that is at issue here is a voluntary statement. To the extent that this Court wishes to engage in a further analysis of the voluntariness, it's a totality of the circumstances analysis. And the- Can I see who has the burden? Putting to one side, which I do want to talk about. But just straight up, who has the burden on voluntariness? Is it the government's burden to show that it is voluntary? Or is it the defendant's burden to show that it's not? At the trial level, it is the government. But as this Court recognized in DeGraff-excuse me, DeGraff and Reed v. McKellar, on a habeas case, the petitioner bears the burden of establishing by a preponderance of the evidence that the confession was involuntary. So in this circumstance, initially, the petitioner bears the burden. And, of course, as you recognize, Judge Harris, when we are in the federal habeas context, there is additionally the deference that is due a state court determination. But to be clear, your position is that this claim was not exhausted in the state PCR court, your current position, and so it couldn't have been adjudicated on the merits in the state PCR court. So which-what determination is it that we owe the deference to? Well, Judge Harris, there is-our petitions are a little bit conflicting. We did present in our brief below with the district court. We actually offered effectively a concession that this was exhausted. On appeal, we recognized that- Does that end that point? I mean, haven't you waived even raising it? Your Honor, the precedent of this court suggests that the waiver of exhaustion has to be expressed. That's headed- Expressed, right? It's under the heading statement regarding exhaustion, and it says that the issues raised in the petition are the same as those brought before the state PCR court and are now ripe for review. It's- It's- It's not like I'm reading anything into that. I mean, there is a little bit of hedging language, Your Honor. It says we appear to-upon review, and-but I understand why you could-and that's why I went straight to the voluntariness analysis, because as the district court properly concluded, this-there was no-this statement was not involuntary. It was very clearly voluntary. But even assuming-I really am confused about why the district court didn't apply a deference here, assuming I agree with the district court in your current position that it was not adjudicated on the merits by the state PCR court. I'm sorry, that was your prior position. But it was adjudicated on the merits by the state trial court, right? The state trial court had a two-day suppression hearing and adjudicated it voluntary, so why don't we owe a deference to that determination? I think you do, Judge Harris. I mean, you do- Okay. The trial court determined that. Right. You- Yes. Judge King, I don't want to-I don't want to push too hard on this point. That is this-that is how the process works in West Virginia. I want to say that there was a direct appeal in this case. You can look in the joint appendix. I'm not being critical of it. I'm just saying- No, no, I understand. I've been part of it. And admirably so, and no one would say any different. But what I'm suggesting is there was a direct appeal in this case. There was a direct appeal that was heard by the Supreme Court of Appeals. I mean, you can look in the joint appendix. Sorry, page 92. There's a memorandum decision that comes in this case. There was a second memorandum decision after the state habeas proceedings. So we owe deference. The state trial court, wherein the trial court had said, this is a two-day suppression hearing, vigorously argued this is a voluntary confession. The only way we could grant relief would be if we thought that was a reasonable application of clearly established law. Absolutely, Judge. That's absolutely correct. The district court should have applied and paid deference. I think that's accurate. And this court and every federal court sitting in a federal habeas review owes, as a matter of comedy, that sort of deference to state court determinations. And so we certainly think that deference is appropriate to Judge Duquesne's ruling as a trial judge. And then, again, as a sitting in the post-conviction habeas, he, again. Only if it was exhausted and adjudicated on the merits. Yes, and it was. I mean, the question of, I mean. What was exhausted and adjudicated on the merits? Well, as Judge Harris recognized, this trial judge at the trial level certainly made a determination it was voluntary. The claim was raised in a manner of ineffective assistance of counsel. And so I understand your point. And I will defer to the. . . I'm not saying I think you waived exhaustion, but that doesn't make me think that there was an adjudication on the merits in the state PCR courts, which we have to defer. I think that's fair. I think that's fair. I don't want to challenge you on that point. That makes perfect sense. So, Your Honor, a review of the record in this case. I mean, the Miranda warning is the starting point for any analysis of voluntariness. That's what de Gravenreid versus McKellar says. This court said it's a significant factor. To the extent you want to engage in an analysis of the remaining totality of the circumstances, this is not an extraordinary or unusual police interrogation. It was not excessively lengthy. It lasted, as Judge King recognized, for approximately two and a half hours. In Bergquist versus Tompkins, the United States Supreme Court said, there's no authority for the proposition that an interrogation lasting three hours is inherently coercive. If a three-hour interrogation is not inherently coercive, a two and a half hour. . . They used the two previous statements against him, too. Also. . . Your Honor. . . They interviewed him three times. They did. Three different days. Yes. And the third day is when they gave you the Miranda warning, and that's what they're arguing about here now. Yes. But the first two times, he clearly lied to them. That's correct. He did not confess. But did they use those two interviews against him at trial as well as the third interview? I don't believe so, Judge King. They ended up playing the entirety of the recorded statement from October 4th. That's the third interview. That's the third interview. The Miranda statement. And that's how that came in. Literally, they played the entire two and a half hours before the jury. They didn't have a witness. Did it come out that he had lied to them two times before? I do not believe that the prosecution needed to address those statements because they had the powerful statement from October 4th, the third interview. And so, I mean, I did not try the case, but I completely read the transcript, and I don't believe they brought it up at any point during the record, his previous statements. So just finishing up briefly, this is a regular, perfectly within the realm of normalcy, police interrogation. Contrary to my learned opponent's representations, there were no express promises that were made, as Judge Agee recognized. There was some discussion about what would happen if it turned out that the If it was a 100% accident, the police officer would be a different story. But if you review the transcript of that statement that was made, immediately after that discussion of an accident, there is a colloquy between Mr. Hayes and the officers, where Mr. Hayes says, you're going to take me and process me any way it goes, and the officer says, more than likely. And then when I leave here today, it's going to be in handcuffs. The officer says, more than likely. No reasonable individual could understand, based on that colloquy and others that occurred throughout the inquiry, that making a statement that this was voluntary was just going to end the inquiry, was going to send it all away. And that's not because the police were putting some sort of Hobson's choice in front of the petitioner. What was happening was the police were aware of the significant and serious facts of this case, where a child, a less than two-year-old child, was found, who was in the sole custody of the defendant, of the petitioner, Mr. Hayes, was found with a five-inch skull fracture in the back of her head. The facts of this case put Mr. Hayes in a difficult position. The facts of this case that the police were aware. The fact that he admitted to being the only person who had custody of her from eight in the morning until two when he came to pick up his girlfriend and this situation was revealed. That's what created the difficult choice, not the police interrogation that was occurring. But just as a final point on voluntariness, you can compare this to infamous Supreme Court cases like Ashcraft v. Tennessee, where a defendant was held for 36 hours, interrogated nonstop without rest, sleep, or respite. You can look at Blackburn v. Alabama, where an individual was held in a tiny room for eight or nine hours, totally filled with police officers. Those are the kind of inquisitorial cases where the Supreme Court and this court and other courts have found that that sort of extreme pressure is placed on an individual. You can look at this court's decision in Ferguson v. Boyd, where a police constructed a confession by holding the defendant's so that the defendant, who only wanted his girlfriend to be let out, would confess to let her go. That's a circumstance where psychological pressure is problematic, potentially violative of due process, as this court found. That's not what happened in this case. The police were willing to let Mr. Hayes speak to his girlfriend. They tried to reach out to him. They gave him a cigarette break. They told him at no point was, you know, they had discussions with him. They let him walk around. They didn't do any sort of extreme or odious pressures that are beyond the pale. And so the totality of the circumstances clearly indicate, above and beyond the Miranda waiver, that the statement he gave was voluntary. I'll discuss briefly the second point that was brought up by my opposing counsel. It's important to remember that the question of whether the second point that Judge Johnston issued a certificate of appealability on. Certainly, Judge King. And it's important to remember that the question of whether or not evidentiary hearing in a federal habeas case is warranted. And as a starting point, federal habeas cases are rare. But to the extent we need to think about what sort of claim was brought here, this is not just a ‑‑ federal habeas cases are not just a reworking of the  It's a special remedy to address violations of the Constitution. And an evidentiary hearing is only appropriate if there's some sort of breakdown in the state post-condition process where the factual record is not fully developed. Well, let me ask you a question about whether or not there was a factual finding. Because under AEDPA, we're required to give deference both to express and imply findings. As I understand your argument, it was taken as derived from paragraph 58 of the state habeas court order. State habeas judge made the statement that Dr. Mock testified that he completed this fellowship and training at New Mexico University. And as I understand your argument, you've indicated that that's an applied factual finding that satisfies the West Virginia statute. And we would be required to give deference to that under AEDPA. But the district court disagreed with both the state habeas court and the magistrate court. The district court said that, well, the state court really didn't make any factual finding there. So was there an implied factual finding? And if not, then where do you go? Well, Judge Agee, I think you're correct that there was an implied factual finding. I'm just asking. I'm not saying one way or the other. Did you say there is or wasn't? Well, the state's position is that there is an implied factual finding. Do you agree with Judge Johnston? That's correct, Judge King. We do. Is the implied factual finding that the fellowship he completed was, in fact, certified by the relevant board? Is that what you're saying was implied? Yes. Yes, Judge Harris. The implied factual finding is that Dr. Mock's training at the University of I just have a factual. You started by saying the factual. The question is whether the factual record is complete. And I have all kinds of factual questions. What is the reason to think it wasn't certified? What is going on here? Well, Judge Harris, there is actually no reason to think that it didn't satisfy the requirements of the statute. That was not specifically addressed by trial counsel. I'm sorry, but what exactly are you saying satisfies or doesn't satisfy the requirements of the statute? I just lost your factual training. Okay. Judge, what I'm saying is it is not clear from the record before this court whether or not Dr. Mock's fellowship training would satisfy West Virginia Code 61-210. We still don't know the answer. We don't know the answer to that. I can represent to this court I made efforts to discuss that extrajudicially with Dr. Mock and was unsuccessful. Unfortunately, I can tell you that Dr. Mock is currently the chief medical examiner for the medical examiner's office in the state of West Virginia, and presumably one does not become the chief medical examiner. He is absolutely, at this point, he is the final authority for the medical examiner's office. What I want to get to is that because it does strike me that, I mean, this is all about, we're getting this under the rubric of ineffective assistance, and so there has to be deficient performance by counsel, and maybe I should actually ask a colleague this on the road, but why was counsel supposed to be fishing around to see whether the guy who had been hired under the statute and sort of at least on paper appeared to meet the qualifications, in fact, didn't meet the qualifications? It doesn't strike me as unreasonable for a lawyer to sort of assume, well, he got hired, I assume so. Absolutely. That was certainly a reasonable assumption, and as the district court determined, had defense counsel asked, does your fellowship qualify by the American Board of Pathology, the very likely answer was yes, because he had been hired by the medical examiner's office. And I'm open to the possibility that maybe there's this teeny percentage of a chance that the answer would have been no, but I'm still wondering how that dovetails with ineffective assistance because it would have had to be well below the standards of regular conduct by a lawyer not to have extorted this possibility. And it doesn't dovetail below the standards because the trial counsel engaged in an objectively reasonable attack on Dr. Mock's credibility, and he did that by crossing foot first by vordeering the witness initially when the state's direct, when the state was putting on Dr. Mock's qualifications. He took the witness on vordeer and got Dr. Mock to admit that he was not yet board certified, which put in the mind of the jury the attack on his credibility, and then subsequently during the hour-long cross that you recognized earlier, Judge King, the trial counsel got several specific admissions that could be used to attack Dr. Mock's credibility. Did the trial counsel ever testify at the previous proceedings in West Virginia? Was there a hearing there? Judge King, I'm not sure. I assume there was an omnibus evidentiary hearing because they usually have one. You're entitled to one effectively in most cases under West Virginia law, but I do not remember. We don't have any testimony from the trial lawyer, from the defense lawyer. I can certainly represent to you that the omnibus, if there was an omnibus evidentiary hearing, it is not in the appendix that is currently before this court. But I wanted to just emphasize this. Let me ask you, though, before we leave that. In the end, does it really make a difference? I'd ask opposing counsel this question reading from the West Virginia statute. Does the statutory inquiry that, as I understand their argument, that he contends was not made and that that was an effectual assistance, does that go just to whether or not Dr. Mock was qualified to be employed or whether or not Dr. Mock was qualified to be an expert witness? Those, I think, are two distinct questions. Absolutely, Judge Agee. I think the former would be the state's position. Whether or not an individual satisfies 61-1210 is about whether or not they can be literally hired by the medical examiner's office. Whether they testify as an expert is up to Judge Sakai. Absolutely. The West Virginia rules of evidence, the standards set forth by 701, 702, 704, and then the standard from Gentry v. Mangum, which is the West Virginia Supreme Court of Appeals case that controls experts, that's determined whether or not Dr. Mock was qualified. It's important to recognize that the district court in this case, Judge Johnston, specifically found that Dr. Mock, there was nothing intrinsically wrong with his qualifications. That is, he was perfectly qualified to give the expert opinion that he did in this case. I want to say, I know my time is almost up, but I want to say this very quickly. Did we give any deference to what Judge Johnston thought about it? I believe you reviewed his conclusions of Walden Novo, so his determination of intrinsic qualification is reviewable by this court. But very briefly, Your Honor, and then I will sit down. On cross-examination, the defense counsel got Dr. Mock to admit that Dr. Young is far more experienced than him, that he had more extensive credentials than him, that he was a well-respected forensic pathologist. Your Honor, I see my time is complete. I didn't finish, sir. Wrap it up, sir. There certainly was not deficient performance because the trial counsel did what petitioner wants them to do with this statute, which is put in front of the jury evidence to say our expert, the defense expert, is better than Dr. Mock. And during cross-examination and voir dire and getting Dr. Mock to make those admissions, that's just as good, if not better, than having the statutory admission. And he didn't go into the question of the statute because, as Judge Harris has recognized, the answer was almost certainly going to be, I am qualified under the statute. Thank you, Your Honor. Thank you, sir. Mr. Swindle. May it please the Court. The mother's testimony does not meaningfully corroborate Dr. Mock's, as the only other scenario for the child's injuries was that the child was injured under the mother's watch. So she has a natural incentive to downplay that possibility. But beyond that, Dr. Kaceres, the Pediatric Intensive Care Unit doctor, did testify that it would be unreasonable to think a parrot could tell a skull fracture existed. That is at JA 1378. On top of that, the hospital radiologist did, the first pass-through looking at the CT scan results, did not recognize a skull fracture existed. But turning to Dr. Kaceres' testimony, Dr. Kaceres never testified to the healing of the skull fracture. And whether the skull fracture was healing or not, would have conclusively determined which side's theory of the case was correct. But on top of that, Dr. Kaceres' testimony going to the timing of the skull fracture does not prove Mr. Hayes guilty beyond a reasonable doubt for numerous reasons. It sounds like now you're talking about whether there was prejudice. Yes, Your Honor. Right. Is that something that you view under epidepherence also? It looked to me as though the State Court made a finding that, well, whatever about deficient performance, there wasn't prejudice here anyway. So would we review that under AEDPA? The district court recognized that there is no epidepherence in this case because the PCR court did not address whether Dr. Mock had those qualifications. That's why we said not to defer to that finding, that he was qualified. But it looked to me as though the State Court didn't rest entirely on that, that it went on to say, in any event, there's no prejudice here. Because for all the reasons you're talking about now, there was all this corroborating testimony. So in any event, it wouldn't have made any difference. And I understand the district court did not apply epidepherence, but I'm wondering why not and whether we should because there was this alternative prejudice finding by the post-conviction review court. Yes, Your Honor. I see your position. But I think the district or the PCR court's failure to even inquire into the issue of the lack of qualifications made it so that no deference should apply. You're saying maybe the prejudice finding wasn't entirely independent of this idea that, look, he's qualified. I just don't know why we wouldn't defer to what they said about prejudice. Yes, Your Honor. And I see your position. But I may bring up that Mr. Hayes tried to develop the record through the habeas motions that he did, and the state court completely ignored these motions in contravention of their own rules. But turning back to the prejudice problem, Dr. Kaceres' testimony does not meaningfully corroborate Dr. Mock's, especially to the timing issue as well. Dr. Kaceres testified that the girl's injury is a result of shaken baby syndrome, but then he conceded that shaken baby syndrome is a hypothesis, but many in the medical community consider it a hypothesis and not a science, and it's controversial. He also acknowledged that studies show if a child is to have brain injuries from being shaken, they would also have a broken neck, and here there was no broken neck. Further, Dr. Kaceres testified that the skull fracture could only come as a result of severe trauma, such as a high-impact car accident. But a federal agency has well-documented instances of children receiving skull fractures from falls as little as two feet. And on top of that, Dr. Kaceres testified that Dr. Young's theory of the case, Mr. Hayes' expert, going to the seizure and the swelling was plausible but not likely. Can I ask you the question I asked your colleague about the deficient performance prong here? Why was it deficient? Why don't you tell me. What was the deficiency in counsel's performance and not what was the deficiency in counsel's performance? Yes, Your Honor. So trial counsel was aware that Dr. Mock did not take the anatomical portion of the American Board of Pathology exam. But I thought that part was not part of the question certified for appeal. I thought we were dealing with whether the fellowship satisfied the statutory requirements. Yes, Your Honor. And that goes to the statute itself, because there are two pathways to satisfy that statute. Okay. So since Dr. Mock could not satisfy that first pathway, it's reasonable to assume that the trial counsel was completely unaware of the statute, and that is unreasonable. And if you look at the Elmore v. Osment, a case in this circuit, there the trial counsel's blind acceptance of the state's forensic experts' evidence was considered deficient performance. Because you cannot blindly accept what the state is proper. And here the trial counsel blindly accepted that the state's key witness was qualified under West Virginia law. Was qualified for his job. Yes, Your Honor. Okay. If you also look at State v. Hale, this is a Utah Supreme Court case cited in which the trial counsel put on the stand an expert who was not qualified to testify to CT scans. So once again, you have a trial counsel failing to inquire into the qualifications. But that's inquiring into whether they're qualified to testify as experts, which seems a little more directly related, a little less tangential than whether they happen to be qualified for the job for which they were hired. And I understand it's not entirely divorced from what's going on here, but it's a slightly closer. I had some hesitation about putting every lawyer, every defense counsel, to say that they have fallen well below sort of standards of professional performance if they fail to sort of confirm the accuracy of everybody's resume in a way that doesn't go to their qualifications as an expert, but just their qualifications for the job that they're sitting in. Yes, Your Honor. But if you understand that. Was there something that should have put this lawyer on notice that, wait a minute, maybe this guy's fellowship is not board certified? Was there something? And I'll point you back to the argument I made earlier that he was completely unaware of the statute. And if he was aware of the statute, he would have been put on notice because Dr. Mock could not satisfy the first prong, so naturally you're going to look to the second prong. Right, but what would have put him on notice that the logical inference would be I guess he satisfies the second prong because he got hired. So is there anything that would, this is a genuine question, was there something fishy about this guy's credentials that might have put him on notice that he didn't satisfy that this fellowship he says he did was not properly board certified? He was so new to his job, and so it already goes to his credibility. But, I mean, Your Honor, if you are aware of the statute, it's a simple question of was your certification, was your fellowship certified? And it's such a simple inquiry to be completely unaware of the qualification statute is unreasonable in these circumstances when that witness is the key witness, when it is a battle of the experts. Thank you very much. Thank you. We'll come down and break counsel and take a short break.
judges: Robert B. King, G. Steven Agee, Pamela A. Harris